106 F.3d 400
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Terrance DRAKE, Petitioner-Appellant,
v.
SUPERINTENDENT, TRUMBULL CORRECTIONAL INSTITUTION,
Respondent-Appellee.
 No. 95-4018.
 United States Court of Appeals, Sixth Circuit.
 Jan. 14, 1997.
 
 Before: CONTIE, SUHRHEINRICH, and MOORE, Circuit Judges.
 OPINION
 MOORE, Circuit Judge.
 
 
 1
 Petitioner-Appellant Terrance Drake appeals from the denial of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Drake alleges eleven constitutional violations in the course of his state murder trial: (1) due process and double jeopardy violations through inconsistent jury verdicts; (2) denial of the right to know the nature of the accusation against him; (3) denial of due process by delayed discovery; (4) violation of petitioner's confrontation right when an expert testified as to opinions not based on personal knowledge; (5) denial of due process by jury instructions that created a mandatory presumption with regard to flight; (6) denial of due process by jury instructions containing a less culpable mental state for aiding and abetting than the statutory offense; (7) denial of fundamental fairness when the court instructed the jury to weigh petitioner's testimony differently from other witnesses; (8) denial of due process where petitioner was convicted of aggravated murder upon a showing of mere negligence; (9) denial of due process where the court refused to give instruction for a lesser included offense; (10) denial of the constitutional right to be present when the court answered questions from the jury without notifying petitioner; and (11) denial of due process because there was insufficient evidence of guilt. Upon thorough review, we conclude that none of these arguments warrants the requested habeas corpus relief. Accordingly, the district court's order denying appellant's petition for a writ of habeas corpus is affirmed.
 
 
 2
 * On January 9, 1992, Terrance Drake was indicted by a grand jury on two counts of aggravated murder (murder with prior calculation and design and felony murder) in violation of Ohio Rev.Code Ann. § 2903.01 (West Banks-Baldwin 1996). On February 4, 1992, a second indictment was issued which alleged separate counts of possession of marijuana, aggravated murder (with firearm and felony murder specifications), and aggravated robbery (with a firearm specification). Drake filed a motion to dismiss the charges in the second indictment for failure to comply with Ohio speedy trial provisions. The state trial court dismissed the marijuana and aggravated murder counts in the later indictment, but let stand the aggravated robbery count by consolidating it with the charges alleged in the first indictment.
 
 
 3
 The charges against Drake arose from the killing of Willie Hudson in a store parking lot in East Cleveland, Ohio, on November 19, 1991. On that evening, Rhonda Hite, a passenger in a car traveling southbound on Hayden Avenue, saw three individuals, whom she later identified as Drake, Maurice Gee (the shooter), and Willie Hudson (the victim), talking near a store. Minutes later a police officer who was stopped at a nearby traffic light heard a gunshot. As the officer looked in the direction of the shot, he heard two more shots and saw two males running from a car. Hudson was found lying face down in the store's parking lot, where he later died.
 
 
 4
 Meanwhile, Rhonda Hite had been driven to an apartment building a block away from the store. While she was waiting in the car for her companion to return, she saw two men outside the building and recognized them as two of the three individuals she had seen talking near the store. She watched the two men enter the apartment building. Hite and her companion then returned to the store, where she recognized the victim as being the third individual she had previously seen. She relayed this information to the police.
 
 
 5
 Police officers arrived at the apartment building just as Drake and Gee were exiting the building and entering a car driven by Drake's mother. The police stopped and searched the individuals. No weapons were found, but the police recovered two half-ounce packets of marijuana from Drake's jacket pocket. Hite identified Drake and Gee as the men seen talking with the victim just prior to the shooting.
 
 
 6
 After his arrest, Drake voluntarily stated that Gee had done the shooting. Drake signed a waiver-of-rights card, gave an oral statement to Detective Robert Kalvitz, and later signed a written statement prepared by Kalvitz. At the suppression hearing and at trial Kalvitz testified that Drake gave two slightly different versions of what happened that night. In both versions Drake acknowledged that he and Gee planned to rob Hudson of his marijuana. In the first version Drake admitted to being present when Gee went up to Hudson's car window and shot Hudson from outside the car. The other version, which was incorporated in the written statement, indicated that both Drake and Gee got into Hudson's car, Drake in the front passenger seat and Gee in the rear. When Hudson handed Drake the marijuana, Drake got out and ran. It was only then, as he was running, that Drake heard the gunfire.
 
 
 7
 After Hudson's death, his aunt found a pager on Hudson's bed and delivered it to Detective Kalvitz. When activated, Drake's phone number was one of the two displayed numbers.
 
 
 8
 Following his jury trial on the consolidated aggravated murder and aggravated robbery counts, the jury found Drake not guilty of murder with prior calculation and design and not guilty of the lesser included offense of murder for the first count. The jury found Drake guilty of aggravated (felony) murder with a firearm in the second count and of aggravated robbery with a firearm in the third count. However, the jury found that Drake was not the principal offender nor had he committed the murder with prior calculation and design, and, therefore, the death penalty could not be imposed. See Ohio Rev.Code Ann. § 2929.04(A)(7) (West Banks-Baldwin 1996). On the second count, Drake was sentenced to three years actual incarceration for the firearm specification to be served consecutively with a term of life imprisonment for the murder charge.
 
 
 9
 Drake appealed to the Court of Appeals of Ohio, Cuyahoga County, asserting eighteen assignments of error. That state appellate court found that the trial court erred by not dismissing the aggravated robbery count from the second indictment as time barred. Accordingly, the court vacated Drake's aggravated robbery conviction. The court then overruled the remaining assignments of error and affirmed the aggravated (felony) murder conviction.
 
 
 10
 The Supreme Court of Ohio denied Drake's motion for leave to appeal, and the United States Supreme Court subsequently denied certiorari. Drake v. Ohio, 114 S.Ct. 2717 (1994).
 
 
 11
 On August 2, 1994, Drake filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging eleven constitutional violations. Over Drake's objections, the district court adopted the recommendation of the magistrate judge to dismiss the petition in its entirety. The district court then issued a certificate of probable cause to appeal. In this appeal, which is properly before us for consideration, Drake raises the same eleven grounds for relief.
 
 II
 
 12
 We review de novo a district court's refusal to grant a habeas petition, and the district court's findings of fact are reviewed for clear error. Carter v. Sowders, 5 F.3d 975, 978 (6th Cir.1993), cert. denied, 114 S.Ct. 1867 (1994). We defer to state court factual findings if they are supported by the evidence.[1] Id.
 
 
 13
 * Petitioner asserts that he was denied due process of law and subjected to double jeopardy when the jury returned a guilty verdict for aggravated (felony) murder that was inconsistent with the acquittal by the same jury of murder. Drake was indicted for two distinct forms of aggravated murder: in the first count, murder with prior calculation and design, defined as "[n]o person shall purposely, and with prior calculation and design, cause the death of another," Ohio Rev.Code Ann. § 2903.01(A) (West Banks-Baldwin 1996); and in the second count, felony murder, defined as "[n]o person shall purposely cause the death of another while committing or attempting to commit ... aggravated robbery ...," Ohio Rev.Code Ann. § 2903.01(B) (West Banks-Baldwin 1996). A lesser included offense of both forms of aggravated murder is murder, defined as "[n]o person shall purposely cause the death of another." Ohio Rev.Code Ann. § 2903.02(A) (West Banks-Baldwin 1996). Drake's argument that the jury's acquittal for murder in the first count is inconsistent with and precluded a finding of guilt of aggravated (felony) murder in the second count can be broken down into three components: traditional double jeopardy principles, issue preclusion, and a due process-inconsistent verdict analysis.
 
 
 14
 The verdicts returned in this case do not offend traditional double jeopardy principles. The double jeopardy clause protects against successive prosecution after an acquittal or conviction and against multiple punishments for the same offense. Brown v. Ohio, 432 U.S. 161, 165 (1977). Drake was not twice tried or punished for the same offense; he faced only one prosecution, and he was properly charged with separate and distinct aggravated murder offenses (not the "same offense" pursuant to Blockburger v. United States, 284 U.S. 299 (1932)).
 
 
 15
 Along this vein, Drake asserts a preclusion argument: because the jury should convict if it finds the elements of murder present, then the jury's not guilty verdict on murder can mean only one of two things: either Drake did not possess the intent to kill or he did not "cause" the death of another. Aggravated (felony) murder necessarily incorporates both of those elements, while adding a third (i.e., committed in the course of a felony); therefore, according to Drake, preclusion applies to bar the finding of guilt as to the aggravated (felony) murder charge.
 
 
 16
 The doctrine of collateral estoppel, or in modern terminology "issue preclusion," was first incorporated as a component of constitutional double jeopardy protection in Ashe v. Swenson, 397 U.S. 436 (1970). "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443 (defining issue preclusion). The doctrine of preclusion is ordinarily applied in the context of successive prosecutions. The context here is markedly different--a single jury with a multiple count indictment. This distinction proves fatal to Drake's preclusion claim. When preclusion is invoked jury rationality is assumed in order to protect a defendant from having to relitigate issues already decided in another proceeding in his or her favor. Thus, preclusion arguments are misplaced when the claim is inconsistency in the verdicts in a single case. As stated in United States v. Powell, 469 U.S. 57, 68 (1984), "[t]he problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel--which are predicated on the assumption that the jury acted rationally ...--are no longer useful."
 
 
 17
 Drake's due process contention alleging inconsistent jury verdicts is equally untenable. It is true that the elements of the crime of murder are entirely encompassed within the crime of aggravated (felony) murder. Thus, in the usual inconsistent verdict situation, where both the greater and lesser offense are charged and tried under one count, a finding of not guilty with respect to the lesser offense would preclude a finding of guilt for the greater offense. However, Drake's case does not fit the usual scenario; here, the greater and lesser offenses were charged in two distinct counts of the same indictment.
 
 
 18
 Inconsistent verdicts may not form the basis for setting aside proper convictions on other counts. United States v. Patrick, 965 F.2d 1390, 1397 (6th Cir.), cert. denied, 506 U.S. 940 (1992). The general rule that has been firmly in place for over sixty years is that consistency of the verdicts on several counts of the same indictment is unnecessary where the defendant is convicted on some counts and acquitted on others. Dunn v. United States, 284 U.S. 390, 393 (1932). Dunn is premised on the notion of jury lenity, that "[t]he most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as ... lenity." Id. (quoting Steckler v. United States, 7 F.2d 59, 60 (C.C.A.2 1925)).
 
 
 19
 Dunn 's continued vitality was reaffirmed in United States v. Powell, 469 U.S. 57, 66 (1984), where the Court stated, "[t]he fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable." Even though an "error" has undoubtedly occurred in that the jury did not follow the court's instructions, whether through mistake, compromise, or lenity, "it is unclear whose ox has been gored." Id. at 65. Thus, rather than individualized review of the inconsistent verdicts, the Court instructed that the proper mechanism for protection against jury irrationality is for each count on which a defendant is convicted to be reviewed independently for sufficiency of the evidence. Id. at 66-67; see also United States v. Frazier, 880 F.2d 878, 883 (6th Cir.1989). The Dunn-Powell rule has full effect in Ohio, where, since 1929, "[a]n inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." Browning v. State, 165 N.E. 566 (Ohio 1929) (syllabus para. 4).
 
 
 20
 We are at a loss for reconciling in any rational manner how the jury reached the seemingly incompatible conclusions that Drake did not purposely cause the death of Hudson, but did purposely cause his death while committing an aggravated robbery. Perhaps the jury mistakenly thought it must acquit Drake of the lesser included offense of murder in Count One in order to acquit him of the greater offense of murder with prior calculation and design in Count One. But it is clear that such post-conviction inquiry into the jury's deliberations is not for our consideration. We have been instructed, consistently since 1932, not to ponder the thought processes of a jury with respect to different counts in the same indictment, and we will not do so here. As stated by Justice Rehnquist in Powell, "there is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled." Powell, 469 U.S. at 69. Drake was given the benefit of his acquittal on the first count, and, in view of the long-standing rule of Dunn, reaffirmed in Powell, "it is neither irrational nor illogical to require [him] to accept the burden of conviction on the counts on which the jury convicted." Id.
 
 
 21
 Thus, we conclude that Drake was neither subjected to successive prosecutions nor multiple punishments for the same offense, that his preclusion argument is misplaced, and that allegedly inconsistent verdicts between different counts in an indictment are insulated from review. Drake's conviction for aggravated (felony) murder therefore withstands Drake's first constitutional challenge.
 
 B
 
 22
 Drake next alleges that the bill of particulars filed in his case failed properly to inform him of the nature and cause of the accusation, particularly with respect to whether or not he was the "principal offender" in the crime. There is no doubt that petitioner has a constitutional due process right to be informed of the nature of the accusations against him. Combs v. Tennessee, 530 F.2d 695, 698 (6th Cir.), cert. denied, 425 U.S. 954 (1976). Here, the indictment and the bill of particulars sufficiently informed Drake of the nature of the accusations against him. This information constituted fair notice of the charges. "A bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery." State v. Sellards, 478 N.E.2d 781, 784 (Ohio 1985).
 
 
 23
 Moreover, Drake has failed to show prejudice from not knowing at the outset whether he was being charged as the principal offender. At trial he was well aware that he was being charged as an accomplice. Because accomplice liability is equated with that of the principal, the distinction between principal and accomplice is significant mainly for sentencing purposes. See Ohio Rev.Code Ann. § 2923.03(F) (West Banks-Baldwin 1996); cf. State v. Crooks, 1984 WL 7110 at * 5 (Ohio Ct.App. Dec. 12, 1984) (stating that where "the conduct constituting the crime charged was essentially single and indivisible ... it matters little to a defendant in terms of preparing his defense whether the focus of the trial is upon his conduct as a principal or as a complicitor"). The lack of further specificity in the bill of particulars as to Drake's role in the shooting did not materially prejudice his ability to prepare and present a defense, and is, therefore, without constitutional consequence.
 
 C
 
 24
 Drake's third challenge concerns the admittance into evidence of oral statements made by him to Detective Kalvitz, whose investigative notes, now destroyed, were not provided to Drake during discovery. Although the record before us is far from clear as to this issue, at some point prior to trial Drake was provided with a written summary of his oral statements (prepared by Kalvitz), and a copy of his written statement to the police. J.A. at 196, 204. When the detective testified, he revealed that Drake had initially claimed a version of the events different from the version in the written statement, where Drake admitted to being present with Gee outside the victim's car when the shooting took place. This conflicting version was apparently not set forth in the written summary of Drake's oral statements furnished to the defense.
 
 
 25
 The prosecution substantially complied with discovery. The prosecution did provide Drake with a written summary of Drake's oral statement. The applicable state discovery rule provides for disclosure of oral statements of the defendant in the form of a written summary rather than verbatim transcription. See Ohio R.Crim.P. 16(B)(1)(a)(ii). Drake demonstrated no prejudice which resulted from this partial disclosure. See State v. Bidinost, 644 N.E.2d 318 (Ohio 1994) (no prejudice shown where prosecution failed to provide the defense with a written summary of defendant's oral statement because some notification was provided to the defense and there was no willful violation of discovery rules on the prosecution's part); United States v. Jefferson, 445 F.2d 247 (D.C.Cir.1971) (police officer's notes containing information given by defendant in interview should have been furnished to defense, but failure did not amount to reversible error). The fact that the detective's notes were not provided does not rise to a constitutional level here, where there is no showing that the government acted with deliberateness or bad faith, nor that the statement was material or exculpatory. See United States v. Calhoun, 542 F.2d 1094, 1103-4 (9th Cir.1976), cert. denied, 429 U.S. 1064 (1977) (inability to produce officers' surveillance notes was harmless error). Nondisclosure by the prosecution did not deny Drake a right to due process or a fundamentally fair trial.
 
 D
 
 26
 Drake next alleges that he was denied his constitutional right to cross examination and confrontation when the deputy coroner was allowed to testify about information gathered by other individuals. At trial the coroner, Dr. Stanley F. Seligman, testified that the absence of fouling or strippling around the bullet wound indicated that the gun must have been fired at a distance greater than two-and-a-half to three feet from the victim. J.A. at 199. On cross examination, the coroner stated that he based this opinion on textbooks of forensic pathology and his own experience. J.A. at 202.
 
 
 27
 Because this contention concerns a state evidentiary ruling, the ruling is not to be questioned on federal habeas review unless the fundamental fairness of the trial has been so undermined as to constitute a denial of due process. Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir.1988). It is clear from the record that Dr. Seligman personally conducted the autopsy of Hudson's body. It was within the realm of expert opinion testimony for Dr. Seligman to testify as to what he saw, or did not see, when he evaluated the wound, and what implications arose therefrom, based on his expert knowledge and experience. Drake had a full and fair opportunity to cross examine the coroner with respect to the bases for his opinion. Even if an error occurred here, it does not undermine the fundamental fairness of Drake's trial, where the coroner was subjected to cross examination and the subject matter of the allegedly erroneous testimony was not essential to the government's case nor a significant link in the chain of circumstantial evidence. See Stewart v. Cowan, 528 F.2d 79, 83 (6th Cir.1976). Drake's argument with respect to the coroner's testimony is unavailing.
 
 E
 
 28
 Drake raises several issues with respect to the jury instructions. As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, "unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." Long v. Smith, 663 F.2d 18, 23 (6th Cir.1981), cert. denied, 455 U.S. 1024 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). In Henderson, the Supreme Court stressed that "[t]he question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " Henderson, 431 U.S. at 154 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). None of Drake's asserted instructional errors is so infectious as to render his conviction violative of due process.
 
 
 29
 Drake first alleges that the instruction on flight improperly placed the burden of proof on Drake to rebut a presumption of guilt from flight. The relevant instruction stated:
 
 
 30
 [Y]ou are instructed that flight in and of itself does not raise a presumption of guilty. However, unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the alleged crime. If, therefore, you find that the defendant did flee from the vicinity of the alleged crime and has not satisfactorily explained his conduct in so doing, you may consider this circumstance in the case in determining the guilt or innocence of the defendant.
 
 
 31
 J.A. at 215 (emphasis added). This instruction is constitutionally sound; it unambiguously states that flight, in and of itself, does not raise a presumption of guilt. The instruction clearly communicates that the jury "may" consider unexplained flight in determining guilt or innocence but is not required to do so. The jury is still free to disregard any evidence of flight in determining guilt. The instruction is consistent with Ohio law, in that a jury may consider flight as indicative of consciousness of guilt. State v. Eaton, 249 N.E.2d 897, 906 (Ohio 1969) (syllabus para. 6). We note that although this instruction has met some controversy in Ohio's intermediate appellate courts, see State v. Fields, 300 N.E.2d 207, 210-11 (Ohio Ct.App.1973) (holding that where defendant did not testify, inclusion of "unless satisfactorily explained" compromised defendant's right to remain silent), it has been in regular use in Ohio courts since 1973 and was upheld in the later case of State v. Wilson, 547 N.E.2d 1185 (Ohio Ct.App.1988). See also State v. Taylor, 1995 WL 663267 (Ohio Ct.App. Nov. 9, 1995) (instruction does not constitute plain error where defendant testified and instruction included the language "flight, in and of itself, does not raise a presumption of guilty.") In this case, we conclude that the instruction on flight did not so infect Drake's entire trial as to violate due process.
 
 
 32
 Drake next asserts that the instructions on aiding and abetting permitted a finding of guilt without requiring the prosecution to prove the culpable mental state required for the commission of the offense (i.e., purpose to kill). The instructions stated:
 
 
 33
 No person shall knowingly aid or abet another in the commission of an offense. In this case, if you find that the defendant knowingly aided, ... or associated himself with another for the purpose of committing a crime, he is regarded as if he were the principal offender and is just as guilty as if he performed every act constituting the act.... Complicity in the law means conduct of one who purposely and knowingly participates with another as a partner or an accomplice for the purpose of committing a crime. An accomplice is one who purposely and knowingly assists and joins another in the commission of a crime.
 
 
 34
 J.A. at 215-16. A single jury instruction must be read in the context of the overall instructions, not viewed in artificial isolation. Cupp, 414 U.S. at 146-47. "[U]nder Ohio law, a defendant's purpose to kill must be proved as an essential element of the crime of aggravated murder even where the prosecution proceeds on an aider and abettor theory." Clark v. Jago, 676 F.2d 1099, 1104 (6th Cir.1982), cert. denied, 466 U.S. 977 (1984). "Certainly, purpose to kill may reasonably be inferred from proven facts, and a 'non-triggerman' can be convicted under this statute." Id. What is not acceptable is for the jury to be told that it can infer a defendant's purpose to kill from another person's intent. Here, it was repeatedly explained to the jury that Drake must have acted "purposely" for the crimes put forth. Nowhere do the instructions enable the jury to determine Drake's culpability on the basis of Gee's intent. Accordingly, the instruction on aiding and abetting is not constitutionally defective.
 
 
 35
 Drake further alleges that the trial court erroneously instructed the jury to consider Drake's testimony in a manner different from the testimony of other witnesses. His contention is meritless, and contrary to the explicit language of the instruction:
 
 
 36
 The defendant testified as a witness in this case, and you will weigh his testimony in the same manner as you weigh the testimony of other witnesses who appeared in the case.... You will give his testimony the weight it is entitled to receive, taking into consideration his interest in the outcome of the case, and apply his testimony the same rules that you will apply to the testimony of all other witnesses who appeared in this case.
 
 
 37
 J.A. at 213-14 (emphasis added). Contrary to appellant's assertion, the instruction here unmistakably cautioned the jury against treating Drake's testimony differently from other witnesses.
 
 
 38
 Finally, with respect to the jury instructions, Drake argues that aggravated murder is a specific intent offense but the instruction on causation allowed the jury to convict merely on a showing of negligence. This contention is without merit; the trial court gave a standard instruction on foreseeability that did not transform the culpable mental state into mere negligence. See State v. Burchfield, 611 N.E.2d 819 (Ohio 1993). The jury was repeatedly instructed that Drake could be found guilty only if it found he acted purposely. The causation instruction, viewed in the context of the overall instructions, did not deprive Drake of a fundamentally fair trial.
 
 F
 
 39
 Drake's argument with respect to the failure of the trial court to instruct on a lesser included offense requires more discussion, but ultimately is also without merit. Drake unsuccessfully requested a jury instruction on involuntary manslaughter with respect to the second count. The crime of involuntary manslaughter is defined as "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony." Ohio Rev.Code Ann. § 2903.04(A) (West Banks-Baldwin 1996). "Thus, an involuntary manslaughter instruction is justified 'only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another.' " State v. Campbell, 630 N.E.2d 339, 349 (Ohio 1994) (quoting State v. Thomas, 533 N.E.2d 286, 289 (Ohio 1988)).
 
 
 40
 The failure of a state trial court to instruct a jury on a lesser included offense in a noncapital case is not an error cognizable in federal habeas corpus review, unless, arguably, the failure amounted to a fundamental miscarriage of justice. Bagby v. Sowders, 894 F.2d 792, 795, 797 (6th Cir.) (en banc), cert. denied, 496 U.S. 929 (1990). In a capital case an accused is entitled to instructions on a lesser included offense when the instructions are supported by the evidence. Beck v. Alabama, 447 U.S. 625, 637 (1980); Hopper v. Evans, 456 U.S. 605, 611 (1982).
 
 
 41
 Petitioner asserts that the case against him was tried as a capital case, citing the relevant statute:
 
 
 42
 Aggravated murder when the indictment or the count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances ... is a capital offense.
 
 
 43
 Ohio Rev.Code Ann. § 2901.02(B) (West Banks-Baldwin 1996). The Supreme Court of Ohio has determined that "aggravated murder is a capital offense regardless of whether death may be imposed as a result of the conviction thereof." State v. Henry, 446 N.E.2d 436, 438 (Ohio 1983) (syllabus para. 1).
 
 
 44
 The government responds by asking us to agree with the other circuits that have addressed this issue and that have concluded that a case where the death penalty is ultimately not imposed should be considered a noncapital case for post-conviction due process purposes. See, e.g., Pitts v. Lockhart, 911 F.2d 109 (8th Cir.1990), cert. denied, 501 U.S. 1253 (1991); Trujillo v. Sullivan, 815 F.2d 597 (10th Cir.), cert. denied, 484 U.S. 929 (1987); Rembert v. Dugger, 842 F.2d 301 (11th Cir.), cert. denied, 488 U.S. 969 (1988). In any event, regardless of whether Drake's case is deemed a capital case, the government asserts that the evidence in Drake's trial does not support an involuntary murder instruction because there was no showing that the shooting was somehow unintentional, accidental, or resulting from a non-purposeful act.
 
 
 45
 We need not decide whether to treat this as a capital case for purposes of the inclusion of a lesser included offense instruction because we agree with the government that the evidence in this case does not support an involuntary murder instruction. The evidence concerning the actual shooting was limited, as Drake alleged he was not present at the scene when the gunfire occurred. The coroner testified that, in his opinion, the gun was greater than two-and-a-half to three feet away from the victim when the fatal shot was fired. If the jury credited Kalvitz's testimony about Drake's first version of the events, then the evidence concerning the shooting illustrated that Gee brought the gun to the planned robbery, pointed the gun at Hudson who was sitting inside his car, and pulled the trigger. Under the circumstances there was no evidence put forth that the shooting itself was unintentional, accidental, or the result of a struggle with Hudson; the evidence shows a purposeful killing. Therefore, we do not find evidence in the record below which warrants an instruction on involuntary manslaughter.
 
 
 46
 Moreover, the Ohio Court of Appeals found that "[n]o evidence was presented during the trial which would justify a jury instruction on ... involuntary manslaughter," State v. Drake, 1993 WL 437602 at * 13 (Ohio Ct.App. Oct. 28, 1993), and the Supreme Court of Ohio denied further review. As Ohio's highest court has implicitly ruled on the propriety of an instruction as to state law, we should hesitate to invalidate that determination except under the most unusual circumstances, where the failure to instruct amounts to a fundamental defect resulting in a miscarriage of justice. See Bagby, 894 F.2d at 795.
 
 G
 
 47
 Drake alleges that his constitutional right to be present was violated when the trial court answered questions of the jury during their deliberations without notifying the defense and without the presence of counsel. It is erroneous for a trial court to respond to a jury's question other than in open court and in the presence of counsel for both sides. United States v. Bustamante, 805 F.2d 201, 203 (6th Cir.1986). However, such an error does not automatically compel reversal; the error is reversible only if the court's response to the question is confusing, misleading or potentially harmful to the defendant, or results in "a grave miscarriage of justice." Id.; United States v. Combs, 33 F.3d 667, 670 (6th Cir.1994). In Ohio, "if the communication is not 'substantive,' the error is harmless." State v. Allen, 653 N.E.2d 675, 682 (Ohio 1995).
 
 
 48
 The trial court's responses were not harmful to the petitioner. The court responded to three written questions posed by the jury concerning, first for the firearm specification, whether it mattered who had bought the gun and what "on or about his person" meant, and then whether some exhibits were missing. The court responded that the jury should refer to the instructions previously given and use the ordinary meanings of words, and that the jury had received all the exhibits. The court's response was not substantive and cannot be said to have prejudiced Drake. Therefore, even though the district court's failure to notify and assemble the parties was erroneous, it was harmless.
 
 H
 
 49
 Drake's final contention is that there was insufficient evidence to support his conviction. Our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 50
 Under Ohio law, "[a] jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death." State v. Scott, 400 N.E.2d 375, 382 (Ohio 1980). The evidence here, viewed in the light most favorable to the prosecution, reveals that: Drake and Gee planned jointly to steal the victim's marijuana; Gee brought a gun; Drake described the gun in his statement to the police ("a little bitty gun and it had a brown handle"; R. at 644, Kalvitz Testimony), even though the gun was never recovered and Drake later claimed he never saw it; Drake, Gee, and the victim had been seen talking just moments before the shooting; Drake confessed to carrying out his part in the robbery; an eyewitness saw two men running from the parking lot after the shots; Drake and Gee were found together minutes after the shooting getting into a car approximately a block away from the shooting; and Drake later directed the police to where he thought Gee had disposed of the gun. Moreover, the prosecution presented evidence that Drake initially told the police that he was standing right beside Gee when Gee took out his gun and shot the victim. Therefore, although it is undisputed that Drake was not the triggerman, taking all reasonable inferences in favor of the state, there is sufficient evidence from which to infer that Drake possessed the intent to kill and that he aided and abetted Gee in the fatal shooting during the course of an aggravated robbery.
 
 III
 
 51
 Upon a complete review of the record, we believe Drake received a fundamentally fair trial. We therefore AFFIRM the district court's denial of Drake's petition for writ of habeas corpus.
 
 
 
 [1]
 While this case was pending on appeal, the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 [hereinafter "AEDPA"], was signed into law. The AEDPA altered the standard of federal court review in § 2254 habeas corpus proceedings, strengthening the presumption of correctness for state factual conclusions and incorporating a presumption in favor of state legal conclusions. Compare 28 U.S.C. § 2254(d)-(e), as amended by the AEDPA, with 28 U.S.C. § 2254(d) (1995). Because Drake has failed to show that he is entitled to federal habeas corpus relief under the more expansive, pre-amendment scope of review, it follows that he would also fail to meet a greater burden imposed by the heightened deference required by the AEDPA. See Stone v. Farley, 86 F.3d 712, 716 n. 3 (7th Cir.1996). Accordingly, we need not determine for the present case the effect on pending cases, if any, of the AEDPA's amendments to § 2254 habeas corpus relief